### EDWARD H. McCABE, PLAINTIFF IN ERROR, *v.* LLOYD D. WORTHINGTON.

The act of Congress, passed on the 3d of March, 1807, (2 St. at L. 440,) declared that all claims to land in Missouri should be void unless notice of the claim should be filed with the Recorder of Land Titles, prior to the 1st of July, 1808.

Hence, in the year 1824, a claim which had not been thus filed had no legal existence.

The act of the 26th May, 1824, (4 St. at L. 52,) authorizing the institution of proceedings to try the validity of claims, did not reserve from sale lands, the claims to which had not been filed as above.

Therefore, when the owner of such a claim filed his petition in 1824, which was decided against him; and he brought the case to this court, which was decided in his favor in 1836, but in the mean time entries had been made for parts of the land, the latter were the better titles.

Moreover, the act of May 24, 1828, (4 St. at L. 298,) provides that confirmations and patents under the act of 1824 should only operate as a relinquishment on the part of the United States. Therefore, the confirmation by this court in 1836 was subject to this act.

THIS case was brought up from the Supreme Court of the State of Missouri, by a writ of error issued under the 25th section of the Judiciary Act.

It was an action of ejectment commenced by the plaintiff against the defendant in the State Circuit Court of Missouri, where the defendant had judgment, which, on appeal by the plaintiff to the Supreme Court of the State of Missouri, was affirmed by that court.

McCabe *v.* Worthington.

The plaintiff's title rested on a concession by the Spanish government in 1796, which was confirmed by a decree of the Supreme Court of the United States on the 21st January, 1836, on an appeal from the District Court of Missouri, which exercised jurisdiction of the subject-matter, under the provisions of the act of Congress of May 26th, 1824, entitled "An act enabling the claimants to lands within the limits of the State of Missouri and Territory of Arkansas, to institute proceedings to try the validity of their claims." The petition was filed by the claimant, Antoine Soulard, on the 22d August, 1824.

In January, 1825, an amended petition was filed by Antoine Soulard, who afterwards died; and on the 4th Monday of March following, the proceedings were revived in the name of the widow and heirs of the said Soulard, and such proceedings were had that a decree was rendered against the petitioners by the District Court on the 4th Monday of December, 1825, from which an appeal to the Supreme Court of the United States was taken within one year from its rendition, where, on the 21st January, 1836, the decree of the District Court was reversed, and the claim of the petitioners was confirmed for all the land claimed, except that which had been sold by the United States before the filing of the petition in the case.

In pursuance to this decree, the land claimed and confirmed was surveyed, and the survey returned to the Commissioner of the General Land Office; on which, on the 22d December, 1845, a patent was issued to the petitioners, under whom the plaintiff claims. The land sued for is comprehended within the limits of the survey, and in the patent of Soulard's widow and heirs. No notice in writing, stating the nature and extent of his claim, was ever delivered by Soulard to the Recorder of Land Titles under any of the acts of Congress in relation to that subject. The defendant relied on patents from the United States issued in the year 1836, founded on entries made in the year 1834, while the case of Soulard, widow and heirs, against the United States, was pending in the Supreme Court; which patents embraced the land in controversy.

On the trial in the State Circuit Court, the counsel for the plaintiff prayed the court to instruct the jury as follows : —

*First.* That the decree of confirmation, made by the Supreme Court of the United States on the 21st day of January, 1836, to Julia Soulard, widow, and James G. Soulard and others, heirs of Antoine Soulard, deceased, relates back to the time of filing the petition for confirmation, and passes to the confirmees the title to the land thereby confirmed, so as to cut out all titles and claims thereto originating after the filing of said petition.

*Second.* If the jury believe from the evidence that the land

sued for was patented by the United States on the 22d day of December, 1845, to the widow and heirs of Antoine Soulard, deceased; that such patent was issued for land surveyed for said patentees in pursuance of a decree of confirmation made by the Supreme Court of the United States; and that such decree of confirmation was founded on a petition for a confirmation filed in the United States Court for the District of Missouri, on the 22d day of August, 1824, such patent conveyed to the patentees a better title to the land sued for than that derived from an entry of the same made after the said 22d of August, 1824, or from a patent issued on such entry.

*Third.* If the jury believe from the evidence that Antoine Soulard, on the 22d day of August, 1824, petitioned the District Court of the State of Missouri for the confirmation of his title to a claim for 10,000 arpens of land; that said Antoine Soulard died, and the suit was revived and prosecuted in the name of his widow and children; that the said District Court decreed against the said claim; that said suit was appealed to the Supreme Court of the United States, within one year from the time of the rendition of said decree by the District Court; that said Supreme Court afterwards decided in favor of the said claim, and by a decree confirmed the same to said widow and heirs; that the surveyor of public lands for the State of Missouri caused the land specified in said decree to be surveyed for said confirmees;—if the jury find these facts to be true, then the said widow and heirs of Antoine Soulard had, by virtue thereof, a better title to the land included in such survey than the defendant can have to any part of it by virtue of an entry made after the said 22d of August, 1824, or by virtue of a patent issued on said entry.

*Fourth.* The title under the confirmation of the Supreme Court of the United States to the representatives of Antoine Soulard is a better title than that of the defendant.

*Fifth.* The act of May the 26th, 1824, passed by the Congress of the United States, reserved from sale the lands included within the bounds of all claims of the character embraced within the provisions of the first section of that act, from the time of the filing of the petition for confirmation of such claims in the District Court of Missouri, until such time as said claims should be finally decided against the claimants.

*Sixth.* Any entry of land made within the limits of any claim, of the character embraced within the provisions of the first section of the act of May 26th, 1824, after the filing of the petition of the claimant in the District Court, as provided for by said act, and before said claim shall be finally decided against the claimant, is a void entry, and the patent issued thereon is a

void patent. Which instructions the court refused to give; to which refusal the plaintiff then and there at the time excepted.

And the court, on motion of defendant, gave the following instructions, to wit:—

1. If notice of the Soulard claim was not filed with the Recorder of Land Titles in St. Louis prior to the first day of July, 1808, then said claim was not by law reserved from sale; and, if not reserved from sale by law, was subjected to sale as other public lands.

2. If Soulard's claim was not reserved from sale, then the entry of the defendant, if made according to law, being older, is a better title than the plaintiff's confirmation.

3. The patent of the defendant is *primâ facie* evidence that this entry was regular and lawful.

4. The act of Congress of 26th May, 1824, under which Soulard's claim was confirmed, did reserve from sale the land covered by said claim, and any sales of such lands regularly made prior to the confirmation, conveys to the purchaser a better title than said confirmation, such claim not having been filed with the recorder prior to July 1st, 1808.

5. The commencement of a suit by Soulard in the United States Court, for the purpose of obtaining a confirmation of his claim, did not operate as notice of his claim, so as to affect a title otherwise regularly obtained from the United States; and sales of such land, made after the commencement of this suit, stands upon the same ground as if made before such suit was commenced.

To the giving of which instructions the plaintiff then and there at the time excepted.

Upon these exceptions the case went up to the Supreme Court of Missouri, where the judgment of the court below was affirmed. And to review this decision the case was brought here.

It was argued by *Mr. Geyer*, for the plaintiff in error, and *Mr. Wells*, for the defendant in error

*Mr. Geyer*, for the plaintiff in error.

The Supreme Court of the State of Missouri on the appeal, decided that the claim of Antoine Soulard, at the date of the act of 1824, had no legal existence; the United States were under no obligation, moral or political, to make any provision for its recognition or confirmation; it was forfeited, by reason of its owner failing to give notice of it within the time prescribed by law. That the act of 1824 conferred a gratuity, and the claimants under it, especially those in the class of Soulard, were applicant to the bounty or favor of Congress. The land

claimed was public land, liable to sale and entry as other public lands, pending the suit.

The plaintiff in error submits that the decree of confirmation made by the court on the 21st of January, 1836, vested in Julia Soulard, widow, and James G. Soulard, and the other heirs of Antoine Soulard, deceased, all the title of the United States in the land in controversy, as it was at the commencement of the suit, and consequently that the sale pending the suit was void.

1. The act of Congress, of May 26, 1824, under which the proceedings were had, was not designed to confer gratuities upon claimants, but to provide a remedy by which legal, just, and *bonâ fide* claims might be established. " The mischief intended to be provided for by the act, was the inchoate or incomplete condition of titles having a fair, and just, and legal inception, under either the French or Spanish governments of Louisiana, but which by reason of the abdication or superseding of their governments, and by that cause only, had not been completed." The United States *v.* Reynes, 9 Howard, 127, 145; 4 Stat. at Large, 52.

2. It may be conceded that the claim of Soulard was barred as against the United States by the neglect to file notice thereof, as required by the act of March 3, 1807, yet as the bar was removed by the act of May 26, 1824, and the land remained undisposed of, the claim was restored to its original standing, precisely as if the act of 1807 had not passed. The act of 1824 enables all claimants, under incomplete titles, having a fair, legal, and just origin, to bring such titles before the courts of the United States, and there establish them by proof of the legality and justice of their origin and character, without regard to any proceedings or notice under previous acts of Congress.

3. The effect of the act of 1824, is to reserve from sale and location the lands embraced by any incomplete title, within the description of the first section, until the final decision of the case where a suit is prosecuted, and for two years where the claimant fails to prosecute his claim under the act. See sections 5 and 7, and the case of Stoddard *v.* Chambers, 2 Howard, 284.

*Mr. Wells*, for defendant in error.

Did the court err in refusing to give the instructions prayed for by the plaintiff, or in giving those for the defendant?

1. It is clear that Soulard's claim was not reserved from sale by the acts of 1811 or 1818, or, indeed, by any other act prior to that of May 26, 1824; for the only condition upon which such reservations were made, was that notice of the claim should have been filed with the Recorder of Land Titles, on or before the 1st of July, 1808. Of this claim no such notice had

ever been filed. It stood then by the terms of the acts of the 2d March, 1805, and of March 3, 1807, a barred claim. The fifth section of the latter act provided that " the rights of such persons as shall neglect to file such notices within the time therein limited (the 1st July, 1808,) shall, so far as they are derived from, or founded on any act of Congress, ever after be barred and become void, and the evidences of their claims never after admitted as evidence in any court of law or equity whatever." The claim then, at the date of the act of 1824, was wholly destitute of merit. Whatever claims it might originally have had upon the justice of the government, had long since been lost by the laches of the claimant, and by the lapse of time. Its confirmation to him then was a mere naked gratuity.

2. The act of May 26, 1824, did not make any express provision for the reservation of this or any other claim. Its provisions extended to two classes of claims — those which had been filed with the recorder, as required by law, and which were reserved by the acts of 1811 and 1818, and those which had not been so filed and reserved. And, indeed, it is the only act of Congress that has ever opened the door for confirmation to this latter class, since they were barred.

The fifth section of the act provides, " That any claim to lands, tenements, or hereditaments, within the provisions of this act, which shall not be brought by petition before said courts, within two years from the passing of this act, or which after being brought before the said courts, shall on account of the neglect or delay of the claimant, not be prosecuted to a final decision within three years, shall be forever barred, both at law and in equity, and no other action at common law or proceeding in equity shall ever thereafter be sustained in any court whatever in relation to said claims."

This provision can only relate to the class of claims which had, by former laws, been reserved from sale. As to the other class, they were already, by the act of 1807, barred, and no new legislation was required to bar them. Those which had been reserved must continue to stand reserved until some act was passed to take off the reservation. This fifth section effectually secured that object. It could not have been intended to bar a claim already barred, and liable to be sold as other public land.

But the fifth section only barred the claims from future adjudication. It did not provide for the sale of the lands within those claims. When the claim ceased to be held up for adjudication, it became necessary, according to the policy of Congress, that the land should be offered for sale as other public land.

And accordingly the seventh section of the act was introduced for that purpose. It reads thus : " That in each and every case tried under the provisions of this act, which shall be finally decided against the claimant, and in each and every case in which any claim cognizable under the terms of this act, shall be barred by virtue of any of the provisions contained therein, the land specified in such claim shall forthwith be held and taken as a part of the public lands of the United States, subject to the same disposition as any other public land in the same district."

It is this section which it is supposed operated by implication to establish the reservation of Soulard's claim. But it is clear that it could not relate to that class of claims. It relates to claims barred by the provisions of this act. Soulard's claim was not barred by this act, for it had been barred many years before by the acts of 1805, 1806, and 1807. It had been incorporated with the other public lands, and surveyed, and offered for sale with them. No new legislation was required to put it in the market, for it was already in market, and as stated by the petitioner himself in his petition to the district court, " the quantity of one thousand nine hundred and forty-seven acres and thirty-five hundredths, had been definitively sold by the United States," and he gives the names of the persons to whom sold. See Record, page 7.

The language of the act is, " shall forthwith be held and taken as a part of the public lands of the United States." This language is appropriate when applied to lands which had always been reserved from sale; which had never been in market; which had been treated as private property, and never " held and taken as a part of the public lands of the United States," but can have no proper application to those lands which had in every respect been subject to all the laws relating to public lands since 1808.

3. But there are other provisions of the act of 1814, which preclude the idea that it was intended by Congress, that the title acquired by the claimant should ever be brought into conflict with sales made by the United States.

The sixth section provides that the clerk of the court shall furnish the successful claimant with a copy of the decree, who shall deliver it to the Surveyor of Public Lands in Missouri. And the surveyor shall cause the same to be surveyed. The eleventh section then provides, " That if in any case it should so happen that the lands, tenements, or hereditaments, decreed to any claimant under the provisions of this act, shall have been sold by the United States or otherwise disposed of, or if the same shall not have been heretofore located in each and

every such case, it shall and may be lawful for the party interested to enter after the same shall have been offered at public sale, the like quantity of lands in parcels, conformable to sectional divisions and subdivisions, in any land-office in the State of Missouri," &c.

Now in order to understand more clearly the import of the phrase in this section, "lands, tenements, or hereditaments, decreed to any claimant," it will be necessary to examine for a moment the provisions of the first section. By that section the claimant was not only required to set out his own title in full, but also "the name or names of any person or persons claiming the same or any part thereof by a different title from that of the petitioner." This was done by Soulard in his petition. He showed that 1,947.35-100 arpens had been sold by the United States, to other persons, before his suit was brought. He did not claim this land, but claimed the residue of the 10,000 arpens. It could not, then, have been this land, already sold, which the act of Congress supposed might be "decreed to the complainant." This could not have been decreed to him under any circumstances. He did not ask for it, nor could he demand it, for it had already been lawfully sold to other persons. It was then a part of the residue that the statute contemplated might be decreed to him, when it had already been sold by the United States, and it was this for which this section provided. To give the act this construction leaves it in harmony with all the legislation of Congress on the subject. It has been the uniform policy of Congress to protect those to whom they have sold for a valuable consideration. To say that Congress, by this provision, intended to protect those entries only which had been made before the suit was brought, is to impute to that body the folly of passing a law which, so far at least as this class of cases are affected, was wholly unnecessary. These entries were lawful and valid, and needed no legislation to protect them from subsequent grants. But to construe the provision to extend to entries made at any time prior to the decree, is to place the act of 1824 upon the ground of the act of July 4, 1836, and, it is believed all other acts for the confirmation of such claims. In the case of Menard's heirs *v.* Massie, this court has held that the second section of that act protects all lands sold by the United States. In that case (8 Howard, 308,) the Court says:

"From the first act, passed in 1805, up to the present time, Congress has never allowed to these claims any standing other than mere orders of survey, and promises to give title; and which promises addressed themselves to the sovereign power in its political and legislative capacity, and which must act before the courts of justice could interfere to protect the claim. And

so this court has uniformly held. The title of Cerre, having no standing in court before it was confirmed, it must of necessity take date from its confirmation, and cannot relate back so as to overreach the patents made in 1826 and 1827." These remarks apply with eminent force to Soulard's claim. It was a claim which had been barred, and abandoned by the claimant for twenty years.

In the case cited, the Spanish claim had been filed with the recorder, and was so far within the provisions of the acts reserving such claims. But it had never been surveyed. In relation to this branch of the case, the court remarks : " In reserving lands from sale, it was necessary to know where they were situated, and how far they interfered with the public surveys. Either the President or some other officer must have had the power to designate the lands as those adjoining to salt springs, or lead mines; or it must have appeared in some public office appertaining to the Land Department, what the boundaries of reserved lands were; and if it did not appear, no notice of the claim could be taken by the surveyors, nor by the registers and receivers, when making sales." 8 Howard, 309.

I request the court to note the fact, apparent from the record, that no record or memorandum of this claim was to be found in any office belonging to the Land Department, except in Soulard's old book of Spanish surveys. There he states in his petition he recorded it. But no attention was ever given by surveyors or other officers, to the surveys of claims not recorded. No copy of such surveys were ever sent to the Register's office. Even if Congress had in terms required him to withhold this land from sale, it would have been impossible for him to do so. He could not know where it was.

When the act of February 17, 1818, passed just before the land sales in Missouri, requiring certain claims to be reserved from sale, an order was issued from the Land Department directing the Recorder of Land Titles to furnish to the several registers descriptive lists of such land within their respective districts, as the act required, should be withheld from sale. Had this not been done, the registers would have been unable to carry into effect the act of 1818. As it was, large quantities of those lands were sold through mistake, and even these sales were protected by the second section of the act of July 4, 1836. But in this case the register had no such information. Congress could not have intended that he should suspend any of his sales, or adequate provision would have been made to enable him to do so. So obvious was this view of the law, that the learned judge, in delivering the opinion of this court in the case, citing Menard's Heirs *v.* Massey, p. 307, says : " It was

therefore manifest that claims resting on the first incipient steps must depend for their sanction and completion upon the sovereign power, and to this course claimants had no just cause to object, as their condition was the same under the Spanish government. No standing, therefore, in any ordinary judicial tribunal has ever been allowed to these claims, until Congress has confirmed them and vested the title in the claimant. Such, undoubtedly, is the doctrine assumed by our legislation. To go no further, the act of May 26, 1824, allowing claimants a right to present their claims in a court of justice, pronounces on their true character. It declares that the claim presented for adjudication must be such a one as might have been perfected into a complete title, under and in conformity to the laws, usages, and customs of the government under which the same originated, had the sovereignty not been transferred to the United States; and by the 6th section, when a decree has been had favorable to the claim, a survey of the land shall be ordered and a patent issue therefor; and by section eleventh, if the decree shall be in the claimant's favor, and the land has been sold by the United States or otherwise disposed of, the interested party shall be allowed to enter an equal quantity of land elsewhere."

This admits of no comment.

4th. But it is said that the filing of his petition for confirmation, by Soulard, in the District Court, was notice, and that no one could purchase the land in prejudice of his right.

The rule here invoked is this: When a party commences judicial proceedings for the purpose of establishing his right to a particular piece of property, no one is permitted to purchase that property of another, and claim to be an innocent purchaser, without notice. The pendency of his suit is notice of all the right the plaintiff has. But in the case of Soulard he had no right or title whatever, to the lands for which he sued. It belonged to the government and not to him; and if it belonged to the government, then the government might lawfully sell it to any one before it granted to him. He petitioned for a grant of the land, and when he obtained his grant, he acquired only the title which the government then had. His petition to the court placed him on the ground of all other applicants for a grant of land, the title to which was in the government. He who first obtains the title, and not he who first applies, will hold it.

With these remarks, and the able argument of the learned judge who delivered the opinion of the Supreme Court of Missouri, the defendant in error submits this case.

Mr. Justice CATRON delivered the opinion of the court.

This cause comes here by writ of error to the Supreme Court

of Missouri, under the twenty-fifth section of the Judiciary Act. The error assumed to have been committed below, is that the court misconstrued the act of May 26, 1824, enabling claimants to lands in Missouri, to institute proceedings to try the validity of their claims.

The action being an ejectment, and the defendant in possession by virtue of patents from the United States, the only question is whether the plaintiff has a better legal title.

The plaintiff relies on a decree of this court, made in 1836, in favor of Soulard's heirs against the United States for 10,000 arpens of land including the premises sued for. The decree is of younger date than the entries of the defendant, which were made in 1834, and are a good title to sustain or defend an ejectment in Missouri.

Soulard's claim was filed in the District Court, in August, 1824, and a confirmation demanded, but which was refused, and the petition dismissed in 1825; from this decree an appeal was prosecuted, and in 1836, a decree was rendered by this court confirming the claim. And the question here is, whether the decree in the Supreme Court related back to the date of filing the petition against the United States in the District Court. If it did, then the plaintiff is entitled to recover; and if it did not, then the judgment below must be affirmed.

The act of March 3, 1807, declared that all claims to lands should be void unless notice of the claim, &c., should be filed with the Recorder of Land Titles, prior to the first of July, 1808. Soulard's claim was not filed with the recorder, nor was it presented to any tribunal for action on it, till suit was brought in 1824, in the District Court. Up to that time, the land claimed was subject to sale. This is admitted: But the argument for the plaintiff is, that the act of 1824 removed the bar, and restored the claim to its original standing as if the act of 1807 had not been passed. Admitting this to be true, still it proves nothing, as the United States could beyond question have sold this land before 1807, and passed the legal title; and hence the removal of the bar, imposed by that act, left the land equally open to sale at any time after 1807, as it was before that time.

The act of February 17, 1818, laid off local land districts in Missouri, one of which embraced the land in dispute, and provided for the sale of public lands, from time to time, in each district. But an exception was made according to the act of 1811: That till after the decision of Congress thereon, no tract of land shall be offered for sale, the claim to which, has been in due time, and according to law, presented to the Recorder of Land Titles, and filed in his office.

The claims thus reserved from sale were the ones Congress supposed would come before the District Court and be adjudicated under the act of 1824; and as they stood protected from sale, no further provision was made by the act to protect such claims as that of Soulard, which had never been recorded.

Having given no additional protection by the act of 1824, and Congress having the power to grant the land, or to cause it to be done, through the department of public lands, the Commissioner of the General Land Office (June 25, 1831) ordered the registers and receivers of the various land districts in Missouri to proceed to sell the lands, not adjudicated under the act of 1824, which had been subject to adjudication: holding that, notwithstanding, the provisions of the acts of 1811 and 1818, all claims not brought before the court, or if brought, not prosecuted to a final decision in three years by reason of neglect on the part of the claimant, were subject to be offered at public sale. Volume of Instructions and Opinions, No. 704. Under this established construction, the land in question was sold to the defendant. He could not know that Soulard's heirs claimed the land, as their claim was nowhere recorded in any office appertaining to the department of public lands; and if he had known that such claim existed, still the land court in Missouri had ceased to exist on the 26th of May, 1830, four years before he purchased: Soulard's claim had been rejected in that court, and had been pending on appeal in the Supreme Court, for nearly ten years after the suit was instituted; whereas the act of 1824, required that it should be prosecuted to a final decision within three years. Thus stand the equities of the defendant. But another consideration is conclusive of this case: The act of May 24, 1828, § 2, provides, that confirmations had by virtue of the act of 1824, and patents issued thereon, should only operate as relinquishments on the part of the United States, and should in nowise affect the right or title, either in law or equity, of adverse claimants to the same land. The act spoke of confirmations by decree, and declared that the decree should operate prospectively; and consequently embraced a case, where the land was acquired by purchase from the United States before the decree was made, unless the acts of 1811 and 1818 protected the land from sale. For these reasons, we agree with the Supreme Court of Missouri, that the defendant has the older and better legal title, and order the judgment to be affirmed.

## *Order.*

This cause came on to be heard on this transcript of the record from the Supreme Court of the State of Missouri. and

was argued by counsel. On consideration whereof it is now here ordered, and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.