## Stewart *et al. v.* Trenier.

### *Real Action in Nature of Ejectment.*

1. *Ancient French claim of Nicholas Baudin's heirs to island Mon Louis.* — The cession by the French government of Louisania, 1710–13, to Nicholas Baudin, of "the land of Grosse Point, to begin at, and run along the course of Fowl River, till it reaches the Oysters (Oyster Pass), which separate Massacre Island from the main land;" purporting to convey "the entire cession and transfer of the said land, with its circumstances and dependencies, in order that he, his children, heirs, or assigns, may enjóy and use it from henceforward and forever, without being liable to be troubled or disturbed in the peaceable possession thereof;" which was not excessive in the quantity of land granted, about 14,000 acres, according to the usage of the French government at that time, and was officially recognized by the different governments who successively had dominion over the country, until its acquisition by the United States in 1803; during all of which time, the land was claimed and occupied, without molestation, by said Baudin and his heirs; and

[Stewart v. Trenier.]

which was confirmed by act of Congress in 1829, as recommended in the report of the commissioners (5 Amer. State Papers, 130), but with a reservation in favor of the prior conflicting claims of other persons, — is a complete grant, conveying the fee simple to the lands (now known as Mon Louis Island) within the specified boundaries, which are sufficiently definite and certain without any survey; is protected, as a valid and complete title, by the third article of the treaty of 1803 between the United States and France; and is superior to a title derived by donation from the United States in 1822 to an actual settler, which was consummated by patent in 1870, containing a similar reservation as to the conflicting claims of other persons.

2. *Transcript of official papers in land office; how authenticated.* — A transcript of any official document in any land office in this State, duly certified by the register, is admissible as evidence under the statute (Rev. Code, § 2691), though the certificate is without seal and without date.

APPEAL from the Circuit Court of Mobile.

Tried before the Hon. JOHN ELLIOTT.

This action was brought by Isabella P. Stewart and Wesley W. McGuire (the latter suing as the administrator of the estate of Eleanor M. Cannon, deceased), against John Trenier, to recover the possession of a tract of land which was described in the complaint as " Shares designated as one, two, three, and five, comprising four fifths of fractional section nineteen, and section twenty, in township seven south, and range one west," and which the plaintiffs claimed as tenants in common. The land in controversy is a part of Mon Louis Island, which is formed by Fowl River and Mobile Bay. The plaintiffs deduced their title from Nicholas Baudin, an old French owner or claimant, which was confirmed by act of Congress in favor of his heirs in 1829; while the defendant claimed under Henry Francois, to whom, as an actual settler prior to 1819, the land was confirmed as a donation by act of Congress, in 1822, and a patent issued to his heirs in 1870.

In proof of their title, the plaintiffs read from the third volume of the American State Papers the entries on pages 19, 20 relative to the claim of said Nicholas Baudin, contained in the " Register of claims to land in the district east of Pearl River, in Louisiana, derived from either the French, British, or Spanish government, which, from the circumstances, require a special report," together with the accompanying special report of the commissioner, William Crawford, who had been appointed under the provisions of the acts of Congress for the adjustment of the claims to land in the Territory of Louisiana, ceded to the United States by the treaty with France in 1803, and whose report was submitted to Congress in 1816. The entries in said " Register," in reference to said claim, are in these words: " By whom claimed: *Heirs of Nicholas Baudin.* Original claimant: *Nicholas Baudin.* Nature of claim, and from what authority: *French concession.* Date of claim: 15 *Septemb.* 1713. Quantity claimed: 14,360 arpens. Where situated: *Fowl River.* By whom issued: *La Mothe Cadillac.*

[Stewart *v.* Trenier.]

Surveyed : *No survey.* Cultivation and inhabitation : *Proved from* 1804 *to* 1813." The commissioner's report on the claim is as follows : —

" The claim of the heirs of Nicholas Baudin to an island in Fowl River, being ten or twelve miles in length, and from two to three miles wide, is founded on the following documents :

" (Translated from the French.)

" We, lieutenant of the King, and commandant of Fort Louisiana, and Dartiguette, King's counsellor, commissary ordinary of marine, sent by the order of the court into this colony, have agreed, for the good of his majesty's service in the advancement of this colony, to give contracts of cessions (*des contracts des cessions*) to several inhabitants, to wit : To Mr. Nicholas Baudin, the land of Grosse Point, to begin at, and run along the course of Fowl River, till it reaches the Oysters (Oyster Pass), which separate Massacre Island from the mainland, in order to raise cattle thereon. Of the said land, we have made to him, for, and in the name of his majesty, the entire cession and transfer, with its circumstances and dependencies, in order that he, his children, heirs, or assigns, may enjoy and use it from henceforward and forever, without being troubled or disturbed in the peaceable possession thereof ; not pretending, nevertheless, to derogate in any manner from the rights and pretensions which his majesty might have thereto for the good of his service. Done at Fort Louis of Louisiana, this 21st November, 1710.                " DARTIGUETTE, and
                " BIENVILLE.

" Below is written : ' We, the governor of the province of Louisiana, approve and ratify the said present concession. Done at Fort St. Louis, this 15th September, 1713.
                " ' LA MOTHE CADALLAC.'

" On the margin is sealed a writing, of which the following is a copy : ' This day, the 16th of July, in the morning, 1761, came to the office of the superior council of the province of Louisiana, Mrs. Francis Paille, widow of the deceased Nicholas Baudin, called Mingoin, an inhabitant of this town, who requested us to receive in deposite, in order to be enrolled on our minutes, the above piece and the other parts, in order that recourse may be had thereto when necessary, and copies thereof delivered to whomsoever of right may demand them ; and declared that she did not know how to write, nor sign this, according to the ordinance. In presence of, and assisted by Claude Boriteldet la Leine, her son-in-law.
                " ' BOUTLE.
        " ' And we, the undersigned clerk, CHATAULOU.'
" And joined to the original is a small paper, attached thereto

by a pin, on which is written in English : ' Received from Mr. Monluis two originals and two copies of land grants.' 27 December. 'LUKE RUSSELL.'

" I certify that this present copy is conformable to the original among the archives of the government of Mobile. This 16th June, 1783. JAMES DE LA LAUSAGAE, *N. Public.*

" The original of this, which has been presented to me, exists in the archives of government under my care. Mobile, 18th June, 1783. HENRIQUE GRIMAREST.

" (Inhabitation and cultivation.)

" Thomas Powell, being sworn, saith, that he knows, of his own knowledge, that land claimed by the representatives of Nicholas Baudin, on Fowl River, called the island, has been inhabited and cultivated since the year 1804, and that he believes it was inhabited and cultivated before that period ; that four or five acres had been cultivated.

" THOMAS POWELL."

The plaintiffs then offered in evidence, from the 5th volume of the American State Papers, page 130, the following additional report in reference to the said claim, which was made by John B. Hazard and John Henry Owen, " Commissioners for the adjustment of land claims in the State of Alabama," and which is dated " St. Stephens, Feb. 26, 1828."

" *Special Report,* No. 2. Claim of the heirs of Nicholas Baudin, to an island in Fowl River, called ' Grosse Pointe,' or l'Isle Mon Louis, estimated to contain about 14,360 arpens.

" This claim is founded on a French concession, given at Fort St. Louis, on the 12th November, 1710, by Bienville, lieutenant of the King, and commandant of Fort Louis, and by Dartiguette, commissary ordinary of the marine. These officers, in their deed of concession to Baudin, state their power as emanating from the court to make grants of cession (*des contracts de cession*) in the province of Louisiana ; and under this authority, it appears, they conceded to Nicholas Baudin, the ancestor of the present claimants, the island, or tract of land, called ' Grosse Pointe.' Beneath the concession is the approval and ratification of it by *Lamothe Cudilac,* the Governor of Louisiana, signed on the 15th September, 1713. It appears also, from a writing appended to the document above referred to, signed by *Bontru,* and certified by *Chantalon,* clerk, that Madame Paille, widow of N. Baudin, the original grantee, presented at the office of the superior council of the province of Louisiana the aforesaid deed of concession, together with its approval and ratification, with a request that they would receive the said documents ' in deposite, in order that they might be enrolled on the minutes of the superior council, that

recourse might be had thereto when necessary.' Thus far, the steps taken in this concession were, as far as this board have an opportunity of ascertaining, in accordance with the usage of the French government in granting lands in its provinces ; nor are we aware of any regulation which restricted the authorities of that government in the quantity they might grant. Two certificates were also presented to the board, signed, first, by James de la *Sampaye*, notary public, dated 16th June, 1783 ; and, secondly, by Grimarest, Spanish commandant at Mobile ; stating that the originals, the subjects of which have been recited, existed at that time in the archives of the government at Mobile. Several witnesses prove that the tract claimed has been inhabited and cultivated, from a period prior to 1761 to the present time. The occupancy being uninterrupted for so long a period as is proven, first, under the French grant by which the tract was granted, and successively under the English and Spanish governments, is deemed strongly corroborative of the original grant. This claim is not incumbered with mesne conveyances, but is still in the possession of the descendants of the original *grantor*. From the facts here submitted, the undersigned are of opinion that the foregoing claim is entitled to the favorable consideration of Congress. All which is respectfully submitted." See 5th Amer. State Papers, 130.

This report was made by said commissioners under the authority conferred by the 2d section of the act of Congress approved March 3, 1827, entitled "An act supplementary to the several acts providing for the adjustment of land claims in the State of Alabama," which was read in evidence by the plaintiff, as contained in the 3d volume of United States Statutes at Large, pages 239–40. The claim of said N. Baudin's heirs, as described in said report, and recommended for confirmation, was confirmed by the 2d section of the act of Congress approved March 2, 1829, entitled "An act confirming the reports of the register and receiver of the land office for the district of St. Stephens in the State of Alabama, and for other purposes ; " the 4th section of which act is as follows : "*And be it further enacted*, That the confirmation of all the claims provided for by this act shall amount only to a relinquishment forever, on the part of the United States, of any claim whatever to the tracts of land and town lots so confirmed, and that nothing herein contained shall be construed to affect the claim or claims of any individual, or body politic or corporate, if any such there be." U. S. Statutes at Large, vol. 4, p. 358. The plaintiffs proved mesne conveyances to themselves under this title, and the defendant's possession at the commencement of the suit.

[Stewart *v.* Trenier.]

In proof of his title as one of the heirs of Henry Francois, the defendant read in evidence from the third volume of American State Papers (p. 393) the entries relating to said claim, as contained in the report made by W. Barton, register of the land office at Jackson Court House, dated July 11th, 1820. This report was made under the authority of the act of Congress approved March 3, 1819, entitled " An act for adjusting the claims to land, and establishing land offices in the districts east of the island of New Orleans ; " which granted six hundred and forty acres of land, as a donation, to each actual settler prior to the 13th April, 1813, who did not claim under the French, Spanish, or British government. In the " List of actual settlers in the district east of Pearl River, in Louisiana, prior to the 3d day of March, 1819, who have no claims derived from either the French, British, or Spanish governments," accompanying said report, the following are the entries relating to said claim of Francois: " No. 38. Present claimant: *Heirs of Henry Francois*. Original claimant : *Henry Francois*. Date of present settlement : *For many years*. Date of original settlement : *Previous to* 1808. Where situated : *Isle Mon Louis*."

This claim, with the others contained in said list, was confirmed by act of Congress approved May 8, 1822, entitled "An act supplementary to the several acts for adjusting claims to land, and establishing land offices in the districts east of the island of New Orleans ; " which was read in evidence by the defendant, and the 3d section of which is in these words : "*And be it further enacted*, that every person, or his or her legal representative, whose claim is comprised in the lists of claims reported by registers and receivers, and the persons embraced in the lists of actual settlers, or their legal representatives, not having any written evidence of claim reported as aforesaid, shall, when it appears by the said reports, or by the said lists, that the land claimed or settled on had been actually inhabited or cultivated by such person or persons in whose right he claims, on or before the 15th day of April, 1813, be entitled to a grant for the land so claimed or settled, as a donation : *Provided*, that not more than one tract shall be thus granted to any one person, and the same shall not contain more than six hundred and forty acres ; and that no lands shall be thus granted which are claimed or recognized by the preceding sections of this act, or by virtue of a confirmation under an act entitled ' An act for adjusting the claims to land, and establishing land offices in the districts east of the island of New Orleans,' approved on the 3d day of March, 1819. *And provided, also*, that no claim shall be confirmed, where the quantity was not ascertained, and report made thereon by the registers and receivers, prior to the 25th day of July, 1820." 3 U. S. Statutes at Large, 707–8.

[Stewart *v.* Trenier.]

To show that a certificate of the confirmation of this claim was issued to the "heirs of Henry Francois," and the location of said claim by the direction of the register and receiver, under the provisions of the 4th section of said act of Congress approved on the 8th May, 1822, above mentioned, the defendant offered in evidence two abstracts, or transcripts, from the land office at Mobile, under the certificate of C. T. Stearns, the register, in these words: "U. S. Land Office, Mobile, Ala., August 3, 1870. I, C. T. Stearns, register of the land office at Mobile, do hereby certify that the above abstract is a correct copy of the one on record in this office." The plaintiffs objected to the admission of each of these transcripts: "1st, because there was no seal attached by the register to his certificate; and, 2d, because said transcript is incomplete, and without date." The court overruled the objections, and admitted the transcripts, to which the plaintiffs excepted.

The defendant offered in evidence, also, "a map or diagram, and survey, with field-notes, of Isle Mon Louis, made by James Dowell, deputy surveyor, in 1831, and approved by James H. Weakley, surveyor general, on the 4th July, 1843," which was under the certificate of the register of the land office at Mobile; and a patent from the United States, dated the 5th May, 1870, which was in these words: —

"*The United States of America:* To all to whom these presents shall come, greeting: *Whereas,* there has been deposited in the General Land Office a certificate, numbered one, of the register and receiver of the land office at Mobile, Alabama, with the plat of the survey of the tract of land therein mentioned; whereby it appears that, by the act of Congress approved on the 8th day of May, 1822, entitled 'An act supplementary to the several acts for adjusting the claims to land, and establishing land offices in the districts east of the island of New Orleans,' the claim of the *heirs of Henry Francois,* entered as number 38 in the abstract No. 1, dated 4th July, 1820, of the register and receiver, has been confirmed; and that the same has been surveyed, and designated as section nineteen (19) in township seven (7) south, of range one (1) west, containing six hundred and forty acres, in the district of lands subject to sale at Mobile, in the State of Alabama; the said claim being interfered with by the *junior* confirmation, by Act of 2d March, 1829, of the claim in Hazard & Owen's special report No. 2, dated 26th February, 1828 (American State Papers, vol. 5, p. 130), which latter claim is laid down on the township plat, dated 19th May, 1845, in the General Land Office, in the name of *Alexis D. Durand:* Now, *know ye,* That the United States of America, in consideration of the premises, and in conformity with said act of Congress, have remised, released, and forever

[Stewart *v.* Trenier.]

quitclaimed, and, by these presents, do remise, release; and forever quitclaim, unto the said *heirs of Henry Francois*, or their legal representatives, and to their heirs, the said land above described; subject to any just claim or claims, to all and every part thereof, of all and every person, bodies politic or corporate, derived from the United States, or from either the British, French, or Spanish authorities. *To have and to hold the same*, together with all the rights, privileges, immunities, and appurtenances, of whatever nature, thereunto belonging, subject to any such just claim or claims, as aforesaid, unto the said *heirs of Henry Francois*, or their legal representatives, and to their heirs and assigns forever; so that neither the United States, or any other person claiming under them (except as is provided in said act, and the reservation aforesaid), may or can set up any right or title thereto. *In testimony whereof*," &c.

" Upon the foregoing evidence, the court charged the jury, that the concession, or claim in the nature of a concession, made by certain officers of the French government, in 1710, to Nicholas Baudin, was not a complete grant, and did not convey to said Baudin a perfect title to the land on Mon Louis Island; that the said claim was an imperfect, or inchoate one; that when the United States acquired Louisiana by purchase, that government became invested with the legal title to said land; that the claim or title of Henry Francois, and of his heirs after his death, was also an imperfect title; that, as Congress had confirmed six hundred and forty acres of land in the island to the heirs of Henry Francois, or their legal representatives, before the act of confirmation to the heirs or legal representatives of Nicholas Baudin, then, to the extent of the confirmation to the heirs or legal representatives of the heirs of Henry Francois, they would have the better title, if they were in possession of the land sued for at the time the title was confirmed by Congress; and if they believed, from the evidence, that the land sued for was described in, and covered by the patent from the United States to the heirs of Henry Francois, then the plaintiffs could not recover.

" The plaintiffs excepted to this charge, and requested the court to charge the jury: 1st, that under the title exhibited in this case, the plaintiffs are entitled to recover; 2d, that the grant exhibited in evidence by the plaintiffs is a complete grant of the whole of Mon Louis Island, and conveyed to Nicholas Baudin the legal title to the whole of said island; 3d, that the French government, in making the grant of said island to Nicholas Baudin, transferred all its rights of property in said island to him, and said island thereby became his private property; 4th, that when the province which included said island was suc-

[Stewart *v.* Trenier.]

cessively ceded to England, Spain, France, and the United States, said island continued to be private property, and did not become the property of those governments; 5th, that if the quantity of land claimed by the representatives of Henry Francois was not ascertained, and report made thereon by the register and receiver, prior to the 25th July, 1820, then the said claim was not confirmed by the said Act of 1822. The court refused each of these charges, and the plaintiffs excepted to their refusal."

The admission of the transcripts from the land office, the charge given, and the refusal of the charges asked, are now assigned as error.

THOS. H. HERNDON & JNO. A. CUTHBERT, for the appellants. — 1. The French cession to N. Baudin was a complete and perfect grant, requiring no further action on the part of the government, and no confirmation by the United States. Its language is more full and explicit than any patent issued by the United States. With regard to the time, the language is in a past tense: " we *have* made; " considering the deed as executed, and the transaction finished. With regard to the quantity of land granted, it is " of the said land," referring to the whole of the island. With regard to the extent of the conveyance, whether limited or not, it is " the entire cession and transfer." With regard to the use of it as property, it is " in order that he, his children, heirs, and assigns may enjoy and use it." With regard to the time during which the property is to be held, it is " from henceforward and forever, without being liable to be troubled or disturbed in the peaceable possession thereof." There is no element of a contract in the grant, nor is it conditional. What is said in it about raising cattle on the island cannot be construed as a condition, either precedent or subsequent. Bacon's Abr., *Condition, A. O.;* 10 Peters, 306 ; 15 Peters, 130–39 ; *Baker* v. *Chastang's Heirs,* 18 Ala. 435 ; *United States* v. *Pillerin,* 13 Howard, U. S. 9, 10.

2. Being a perfect and complete title, it is to be regarded as derived from the French government, and required no act of confirmation on the part of the United States. The treaty of 1803 secured to the United States the dominion and sovereignty over the territory, but did not affect the private property rights of the inhabitants. These were expressly protected and reserved to them by the third section of the treaty. " Complete grants or titles, derived from the French or Spanish authorities, passed to the possessor before the cession to the United States ; and no confirmation is needed, nor rights acquired from the United States, they having nothing to grant, either by a stat-

[Stewart v. Trenier.]

ute, or by a mere quitclaim patent." *Doe* v. *Eslava*, 9 Howard, 445; *United States* v. *Arredondo*, 6 Peters, 691–724; *United States* v. *Perchman*, 7 Peters, 87; *Garcia* v. *Lee*, 12 Peters, 519: *United States* v. *Pillerin*, 13 Howard, 10; *Hall* v. *Root*, 19 Ala. 385.

3. If the claim of the heirs of Francois was confirmed by the Act of Congress of May 8, 1822, that confirmation could not affect the prior rights of the plaintiffs, which are expressly reserved. *Hall* v. *Root*, 19 Ala. 396; *Eslava* v. *Doe*, 7 Ala. 543; 9 Peters, 236; 9 Howard, 439.

4. But said claim was not confirmed by that act, because it was not shown that the quantity was ascertained, or any report made in reference to it, prior to the 25th July, 1820, as required by the 3d section of said act.

BOYLES & OVERALL, *contra.* — 1. The French cession to Baudin was void for uncertainty. No surveyor could locate the land from the description contained in the concession. No point is given as the first corner, and no second corner could be established. No description is given, by which the land "at Gross Point" can be identified with Mon Louis Island. No survey was ordered or made, and no map or diagram. It has been repeatedly decided, and in cases where the instrument contained express and clear words of grant, that if the description was vague and indefinite, and there was no official survey to give it a certain location, and separate it from the public domain, it could create no rights of property in any particular parcel of land, which would give the grantee a standing in a court of justice. *Maguire* v *Tyler*, 8 Wallace, 660; *Denise* v. *Ruggles*, 16 Howard, 244; *United States* v. *Forbes*, 15 Peters, 185; *United States* v. *Miranda*, 16 Peters, 159; *Buyck* v. *United States*, 15 Peters, 215; *Houmas Claim*, Opinions of Attorneys General, vol. 4, p. 693; *United States* v. *King*, 3 Howard, 786; *United States* v. *Boisdore*, 11 Howard, 63; *Heirs of De Vilemont* v. *United States*, 13 Howard, 267.

2. There was no survey made under the Spanish or French government, nor was any survey made until 1831. The confirmation of the Baudin claim was made in 1829, before any survey and location had been made. In such cases, no title vested in the claimant, if the commissioners of the land office refused a patent. A patent was refused, and none has been issued. 19 Howard, 202, 252; 18 Howard, 43; 17 Howard, 403; 35 Ala. 120; 39 Ala. 9.

3. The claimants under the Baudin title treated their claim as inchoate and imperfect, as shown by the proof of inhabitation and cultivation, made in 1816, which was followed by a petition to the political department of the government for the confirmation of their claim. " The practical construction which

parties interested have, by their conduct, given to an ancient grant of a large body of land, by general description, is one of the best tests of the intent of the instrument." 6 Wallace, 773.

4. The claim was recognized and treated as an imperfect and inchoate title, both by the executive and by the legislative department of the United States government; and this action is conclusive on the courts. When the survey was made, by order of the government, in 1831, the claim of the heirs of Francois to six hundred and forty acres of the land was designated on the diagram, and also the reservation at Cedar Point of two hundred and ninety-six acres for military purposes. The government reservation at Cedar Point falls with the claim of the heirs of Francois, if the old Spanish concession to Baudin be now construed as a perfect grant.

5. The decision of the commissioner of the general land office, in the contest between the heirs of Baudin and the heirs of Francois, on appeal from the decision of the register and receiver at St. Stephens, is conclusive. *Johnson* v. *Townsley*, 13 Wallace, 72; *Cousins* v. *Blanc's Executor*, 19 Howard, 208.

6. Both grants being imperfect and incomplete, the patent is conclusive in a court of law. *Gibson* v. *Chauteaux*, 13 Wallace, 92; *Hall* v. *Root*, 19 Ala. 395; 2 Howard, 344, 375; 7 Howard, 592.

B. F. SAFFOLD, J. — The action was ejectment, brought by the appellants against the appellee, and decided in favor of the defendant, under charges of the court. The land in controversy is a portion of Mon Louis Island, which is formed by Fowl River and Mobile Bay. The plaintiffs deduced their title from Nicholas Baudin, and the defendant from Henry Francois. The question is, which of the two had the better title. The following is an abstract of their respective titles. [The material facts, as above set forth, were here stated at length.]

On the 10th February, 1763, by a treaty signed at Paris, France, by virtue of her original acquisition, ceded to Great Britain the bay and port of Mobile, and all her possessions on the east side of the Mississippi River, except the town of New Orleans and the island on which it is situated. By the same treaty Spain ceded Florida to Great Britain. By a separate secret treaty, France ceded the remainder of what she called Louisiana to Spain. Great Britain, having previously consolidated her acquisition from France with that from Spain, obtained in 1763, into two provinces, under the name of East and West Florida, ceded them to Spain, by a treaty signed at Versailles on the 3d of September, 1783. On the 1st of October,

[Stewart v. Trenier.]

1800, by the treaty of St. Ildefonso, Spain ceded Louisiana to France, with the boundaries as they were when France possessed it before. On the 30th of April, 1803, France ceded it to the United States, with the same boundaries, by a treaty signed at Paris. The land in controversy is contained within that cession, and governed by that treaty as to the rights of property of individuals.

The third article of the treaty of Paris, of 1803, is in these words: " The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted, as soon as possible, according to the principles of the federal Constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States; and, in the mean time, they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess." Justice DANIEL, in the *United States* v. *Reynes* (9 How. 127), says: " The term *property*, in this article, will embrace rights, either in possession or in action; property to which the title was completed, or that to which the title was not yet completed; but, in either acceptation, it could be applied only to rights founded in justice and good faith, and based upon authority competent to their creation." The article declares only what the international law requires when there is no stipulation — that the United States shall perform to the acquired citizens the duties which were incumbent on France. In all of the legislation of Congress intended to adjust the claims of persons to land under title derived from any of the preceding governments, the authority on which a grant, purporting to have emanated under all the official forms and sanctions of the local governments, has never been required to be filed, recorded, or its validity adjudicated. The inquiry, in this respect, has been confined to the validity and good faith of the grant itself. *United States* v. *Arredondo*, 6 Pet. 691–722.

The contract of cession made to Nicholas Baudin in 1710–13 was reported to Congress in 1816. The commissioners made no recommendation, and no action was taken. This report establishes the presentation and record of the claim, as required by an Act of Congress of 1812, and another of April 18, 1814, together with the inhabitation and cultivation of the land. But it says there was no survey. In *O'Hara* v. *The United States* (15 Pet. 275), it is said a survey would be presumed from a settlement made by the grantee. A further act of Congress for adjusting the claims to land in the district east of the island of New Orleans, approved March 3, 1819, made additional provision for ascertaining the titles complete or inchoate. An Act of March 3, 1827, supplementary to this and others, extended the time for presentation of titles and claims, as pro-

[Stewart *v.* Trenier.]

vided by the Act of 1819, to the 1st of September, 1827. Under this act the claim of Baudin was renewed, reported on favorably by the commissioners, Hazard and Owen, and confirmed by Act of March 2, 1829.

But by an act of May 8, 1822, the claim of Henry Francois to a donation of six hundred and forty acres of the same land, as an actual settler, without claim derived from either the French, British, or Spanish government, was confirmed. A government survey of the island Mon Louis was made in 1831, by James Dowell, deputy surveyor, at the instance of the register and receiver of the land office at St. Stephens, Ala., and was approved on the 4th of July, 1843, by James H. Weakley, surveyor general of the public lands in Alabama. On the 5th of May, 1870, the patent was issued to the heirs of Henry Francois.

In *Burgess* v. *Gray* (16 How. 48) it is held that, under the treaty with France of 1803, no court of justice has jurisdiction to maintain or establish an inchoate and imperfect title to land derived from the French authorities, unless such jurisdiction to try and decide it has first been given by an act of Congress, and that such jurisdiction has certainly not been given to any state court. But if a title so derived was complete, or, being imperfect, has been confirmed, its validity and merits may be determined by the courts under their general jurisdiction, when contested against other titles. The patent to the heirs of Francois mentions the Baudin claim as interfering, by junior confirmation, with the rights of the patentees, and expressly subjects the patent to any just claim derived from either the British, French, or Spanish authorities, or from the United States. The confirmation of Baudin's claim, in 1829, also amounted only to a relinquishment forever, on the part of the United States, of any claim whatever, and was not to affect the claim or claims of any individual or body politic or corporate.

Two propositions are conceded in this case. 1st. If both of these claims depend for their validity on title derived solely from the United States, that of Francois must prevail. He who first obtains the title, and not he who first applies for it, must hold it. *McCabe* v. *Worthington*, 16 How. 86. 2d. If Baudin's title was complete at the time the United States acquired the territory, it is the superior right, by virtue of the treaty. Congress having confirmed the grant or concession to Baudin, as one derived from the French authorities, its genuineness and authority is established. *United States* v. *Arredondo, supra.* Did it sever the land claimed from the public domain? The evidence seems to establish, clearly, that Grosse Pointe was the appellation given to land embraced in the island now called Mon Louis. The contract of cession describes it as "·beginning

[Stewart *v.* Trenier.]

at and running along Fowl River, till it reaches the Oysters (Oyster Pass), which separates Massacre Island from the mainland." The purpose of the gift was " to raise cattle thereon." From the subsequent survey, we see that Fowl River separates the island Mon Louis from the mainland, the other boundaries being the Bay of Mobile and the Gulf of Mexico. " Grosse Pointe " must have referred primarily to some point of land formed by the larger waters, especially as we find two points to which it may have been applied, to wit, Cedar Point and another. These would naturally have become the first objects of notice, and the name given to them would embrace a considerable portion of the back country, it being wild, and imperfectly known. The beginning at Fowl River would be the nearest to the Grosse Pointe. The course would be along that river, from the Pointe to the Oyster Pass. This *pass* was obliged to lead into the Mobile Bay, as we find no other stream forming the island than the river. The tract of land, about 14,000 acres, was not large for a grant of that day. Its situation as an island was admirably adapted for the intended purpose. Its claimants occupied it, under the cession, without interruption, for nearly a hundred years. On every change of the government, they brought up their papers, and demanded an official recognition of their rights. Fifty years after the concession, and just before Great Britain became the sovereign, the widow of the original grantee obtained the recording of her husband's right. Twenty years afterwards, and when the country was about to pass under the dominion of Spain, another assertion of title is made. Nobody interrupts them until the United States acquires possession. The entire cession and transfer of the land, with its circumstances and dependencies, was made to him and his children, heirs, and assigns,`forever, subject only to the right of eminent domain inherent always in the sovereign. We think no survey could more effectually have ascertained the tract, or separated it from the public domain, than was done by Fowl River, designated as its boundary; and, also, that what we call the fee simple was conveyed.

But, if the boundaries were not sufficiently described (the only point about which there can be any question as to the completeness of the grant), Baudin had rights of property to some portion of the land, which the United States recognized its obligation to protect under the treaty of 1803, by confirming them in 1829. The donation to Francois, in 1822, was made subject to them by the act which confirmed it. The government never at any time repudiated Baudin's claim, directly or by necessary implication. In this respect, this case differs from that of *McCabe* v. *Worthington, supra.* If the grant was satisfactorily shown, it has been the practice of the United

[Stewart *v.* Trenier.]

States, either by its courts, or by other agency, to order a survey, if sufficient data existed from which it could be made. The almost accurate estimate of the number of acres embraced in Baudin's claim, made by the commissioners in 1828, previous to any survey, and the confirmation, show how readily the proper boundaries were ascertained. We therefore think that, notwithstanding something may have remained to be done to define more clearly the extent of the grant, as the government, in its confirmation of both claims, reserved the rights of individuals, while relinquishing its own, the claim of Baudin is superior in every respect to that of Francois.

It results from what has been said, that the charge of the court was erroneous, and that the first four charges asked by the plaintiffs ought to have been given. As to the fifth, the patent obtained by the heirs of Francois recognizes the confirmation of their claim in 1822 to 640 acres, and remedies any obscurity in reference to their location.

2. The transcripts from the land office at Mobile, certified by the register, and entitled " Exhibits A and B," were properly admitted in evidence, notwithstanding the objections of want of date, and of the seal. Section 2691 R. C. recites that " all transcripts of any official book, official entry, or any other document pertaining to any land office in this State, certified by the register of such land office, must be received as *primâ facie* evidence of the facts contained in such transcripts so certified, in all the courts of this State." No seal is specified, and, " on general principles of law, a copy of a paper given by a public officer, whose duty it is to keep the original, ought to be received in evidence." *United States* v. *Perchman*, 7 Pet. 51.

The judgment is reversed, and the cause remanded.

NOTE BY REPORTER. — On a subsequent day of the term, in response to an application by the appellee's counsel for a rehearing, the following opinion was delivered : —

SAFFOLD, J. — The appellee insists, that the French concession to Baudin in 1710 is void for uncertainty in the description of the land ; and that there is no evidence in the record to identify Grosse Pointe with Mon Louis Island.

The report to Congress, made in 1816, represents, in Powell's affidavit, that the land was on Fowl River. The report of Hazard & Owen, in 1828, speaks of it as the " claim of the heirs of Nicholas Baudin to an island in Fowl River, called Grosse Pointe, L'isle Mon Louis, estimated to contain about 14,360 arpents ; " and proved by several witnesses to have " been inhabited and cultivated from a period prior to 1761

[Lowndes County v. Hunter.]

to the present time." The patent to the heirs of Francois mentions the Baudin claim as interfering with the rights of the patentees, and subjects itself expressly to the justice of that claim. The map of the United States survey, copied into the transcript, shows the island Mon Louis, formed by Fowl River with Mobile Bay and the Gulf of Mexico. The certificate of Mr. Brown, city engineer of Mobile, appended to the application for rehearing, shows that Oyster Pass is a determinable point, and that it is three or four miles from where Fowl River enters into the bay of the same name. If we read the description of the land given in the concession thus — " to begin at, and run along the (entire) course of Fowl River, till it reaches the Oysters (Oyster Pass), which separate Massacre Island from the mainland," and the Oyster Pass should be near Cedar Point, as I am inclined to think it is, we would have a line of water entirely surrounding Mon Louis Island, except the side bounded by Mobile Bay — derived alone from the concession. The identity of objects mentioned in a deed to designate the land conveyed, or of a distinctive appellation given to it, is obliged to be proved independently.

A rehearing is denied.